**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

TIANA MCCULLAR, individually and on behalf of all others similarly situated,

Plaintiff,

v.

UCM MEDICAL GROUP SUB, LLC d/b/a UCHICAGO MEDICINE MEDICAL GROUP and NATIONWIDE RECOVERY SERVICE, INC.,

Defendants.

Case No. ____________________

CLASS ACTION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Tiana McCullar ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendants UCM Medical Group Sub, LLC d/b/a UChicago Medicine Medical Group ("UCM") and Nationwide Recovery Service, Inc. ("NRS" and with UCM, "Defendants"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard approximately 38,656 individuals' (including Plaintiff's) personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, dates of birth, Social Security numbers, financial account information, and medical information.

2. UCM is an academic medical health system with locations primarily throughout the Chicago area. NRS is a third-party vendor of UCM and provides customer service, collections, and loss mitigation services.

3. Between approximately July 5, 2024, and July 11, 2024, an unauthorized third party gained access to NRS's network systems and accessed and copied files containing the PII/PHI of UCM's patients and the PII/PHI of at least some of its other clients' customers, including Plaintiff and Class members (the "Data Breach").

4. Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security procedures and practices to protect their patients' PII/PHI from unauthorized access and disclosure.

5. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately July 5, 2024, and July 11, 2024.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Tiana McCullar***

7. Plaintiff Tiana McCullar is a citizen of Illinois.

8. Plaintiff is a patient of UCM. As a condition of providing healthcare services to Plaintiff, UCM required Plaintiff to provide it with her PII/PHI.

9. Plaintiff believed UCM had implemented and maintained reasonable security and practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to UCM in connection with obtaining healthcare services from UCM.

10. In connection with providing healthcare services to Plaintiff, UCM shared Plaintiff's PII/PHI with NRS. At all relevant times NRS stored and maintained Plaintiff's PII/PHI on its network systems, including the systems accessed in the Data Breach.

11. Had Plaintiff known that Defendants do not adequately protect the PII/PHI in their possession, she would not have obtained healthcare services from UCM or agreed to entrust it with her PII/PHI.

12. Plaintiff received notice from Defendants notifying her that her PII/PHI was affected in the Data Breach.

13. After the Data Breach occurred, Plaintiff has experienced an increase in the number of spam calls that she receives.

14. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

***Defendant UCM Medical Group Sub, LLC d/b/a UChicago Medicine Medical Group***

15. Defendant UCM Medical Group Sub, LLC d/b/a UChicago Medicine Medical Group is an Illinois corporation with its principal place of business located at 1 Ingalls Drive,

Harvey, IL 60426. It may be served through its registered agent: Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

***Defendant Nationwide Recovery Service, Inc.***

16. Defendant Nationwide Recovery Service, Inc. is a Tennessee corporation with its principal place of business located at 545 Inman St. W, Cleveland, TN 37311. It may be served through its registered agent: Cogency Global Inc., 992 Davidson Dr., Ste. B, Nashville, TN 37205.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has general personal jurisdiction over Defendant UCM Medical Group Sub, LLC because it maintains its principal place of business in this District.

19. The Court has personal jurisdiction over Defendant Nationwide Recovery Service, Inc. because it transacts business in this State and contracts for goods or services in this State

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because UCM's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

21. UCM is an "academic medical health system based on the campus of the University of Chicago on the city's South Side, and with hospitals, outpatient clinics and physician practices

throughout Chicago, its suburbs and Northwest Indiana."[1] It provides a wide range of healthcare services, including cancer care, pediatric care, and neurology.[2] UCM has locations in the Chicago area, northwest Indiana, Springfield, IL, and Peoria, IL.[3]

22. NRS is a debt collection agency and third-party customer service provider based in Tennessee that operates in all fifty states.[4] NRS provided services to UCM at all relevant times.

23. In the regular course of its business, UCM collects and maintains the PII/PHI of its current and former patients, and shares that PII/PHI with third-party vendors, including NRS. UCM required Plaintiff and Class members to provide it with their PII/PHI as a condition of providing them with healthcare services. UCM also shared Plaintiff's and Class members' PII/PHI with NRS.

24. On its website, UCM tells patients "[p]rotecting the privacy of your health information is important."[5] It also promises it "respect[s] the privacy of your medical information."[6]

25. UCM's website contains a Notice of Privacy Practices (the "Privacy Policy"), which describes how Plaintiff and Class members' PII/PHI may be used and disclosed by UCM.[7] This includes for treatment, billing, and organizational purposes.[8]

---

[1] *About the University of Chicago Medicine*, UCHICAGO MED., https://www.uchicagomedicine.org/about-us (last accessed June 9, 2025).
[2] *Conditions & Services*, UCHICAGO MED., https://www.uchicagomedicine.org/conditions-services?view=all (last accessed June 9, 2025).
[3] *Find a Location*, UCHICAGO MED., https://www.uchicagomedicine.org/find-a-location?sort=resulttitlesort_s+asc (last accessed June 9, 2025).
[4] *About NRS*, NRS AGENCY, https://nrsagency.com/#aboutus (last accessed June 9, 2025).
[5] *UChicago Medicine Notice of Privacy Practices*, UCHICAGO MED., https://www.uchicagomedicine.org/about-us/privacy-practices (last accessed June 9, 2025).
[6] *Id.*
[7] *See id.*
[8] *Id.*

26. In the Privacy Policy, UCM tells patients they have a right to "[b]e told if there was unlawful access or use of your medical information."[9] UCM also states it will inform patients of "[t]hings you can do to protect yourself from harm."[10]

27. UCM admits it is required by law to keep its patients' PII/PHI "private and secure."[11]

28. UCM also admits it is required to provide patients with a copy of its Privacy Policy, and that it will have patients sign an acknowledgement that they received a copy of the Privacy Policy.[12]

29. Plaintiff and Class members entrusted UCM or one of NRS's other clients with their PII/PHI in exchange for services and whose PII/PHI was in turn shared with NRS.

***The Data Breach***

30. Between approximately July 5 to July 11, 2024, "an unauthorized individual gained access to NRS systems and obtained information from certain files and folders."[13] The compromised and stolen data included PII/PHI, including that of Plaintiff and Class members, as well as PII/PHI obtained from other customers of NRS.[14] The PII/PHI affected in the Data Breach includes "name, address, date of birth, Social Security number, financial account information,

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Notice of Security Incident by a Third-Party Vendor*, UCHICAGO MED., https://www.uchicagomedicine.org/about-us/privacy-practices/notice-of-security-incident-5-23-25 (last accessed June 9, 2025).
[14] *See* Steve Alder, *Nationwide Recovery Service Data Breach Victim List Grows*, HIPAA JOURNAL (Mary 27, 2025), https://www.hipaajournal.com/nationwide-recovery-service-data-breach/.

and/or medical-related information that may have been provided to them to perform financial services on [UCM's] behalf."[15]

31. UCM recognizes the risk of serious harm Plaintiff and Class members now face as a result of the Data Breach. For example, the data breach notice on UCM's website states UCM "encourage[s] you to remain vigilant for threats of fraud and identity theft by regularly reviewing your account statements and credit reports."[16] UCM goes on to warn patients "read account statements from your healthcare providers, explanations of benefits from your health plan, and other documents related to medical services to make sure they do not include services you did not receive."[17]

32. While NRS learned of the Data Breach on or about July 11, 2024, UCM claims it waited until approximately April 8, 2025—nearly nine months after discovering the Data Breach—to notify UCM that the Data Breach had occurred.[18] UCM did not begin notifying Plaintiff and Class members of the Data Breach until approximately May 23, 2025, over six weeks after learning patient PII/PHI was stolen in the Data Breach and over ten months since the Data Breach occurred.[19]

33. Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff

---

[15] *Notice of Security Incident*, *supra* note **Error! Bookmark not defined.**.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *See Cases Currently Under Investigation*, HHS.GOV, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed June 9, 2025).

and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendants Knew that Criminals Target PII/PHI***

34. At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected, stored, and shared was a target for malicious actors. Despite such knowledge, Defendants failed to, or shared PII/PHI with third-party vendors who failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyberattacks that they should have anticipated and guarded against.

35. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[20]

36. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[21] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[22]

---

[20] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[21] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed June 9, 2025).

[22] *See id*.

37. PII/PHI is a valuable property right.[23] The value of PII/PHI as a commodity is measurable.[24] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[25] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[26] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

38. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[23] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[24] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[25] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[26] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

39. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[27] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[28]

40. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[29] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[30]

41. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[31] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[32]

---

[27] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[28] *Id.*
[29] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[30] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[31] Steager, *supra* note 19.
[32] *Id.*

42. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[33]

43. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

44. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[34] [35]

45. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[33] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[34] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 9, 2025).

[35] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[36]

46. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[37]

47. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[38] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[39] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[40] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[41]

---

[36] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[37] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed June 9, 2025).

[38] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[39] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 22.

[40] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed June 9, 2025).

[41] *Id*.

48. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [42]

49. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[43]

---

[42] *See* Dixon & Emerson, *supra* note 30.

[43] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

50. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

51. Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

52. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

53. Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information and personal health information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

54. Plaintiff also brings this action on behalf of herself and all members of the following subclass (the "UCM Subclass"):

> All persons whose personally identifiable information and personal health information was given to Nationwide Recovery Service, Inc. by UCM Medical Group Sub, LLC and was accessed in the Data Breach by unauthorized persons, including all those persons who were sent a notice of the Data Breach.

55. Excluded from the Class are UCM Medical Group Sub, LLC d/b/a UChicago Medicine Medical Group, and its affiliates, parents, subsidiaries, officers, agents, and directors, Nationwide Recovery Service, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

56. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

57. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. UCM reported that approximately 38,656 patients were affected in the Data Breach.[44]

58. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. Whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security

---

[44] *Cases Currently Under Investigation, supra* note 19.

measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

f. Whether Defendants breached its duties to protect Plaintiff's and Class members' PII/PHI; and

g. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

59. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

60. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

61. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

62. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff

and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

63. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

64. Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI it collected and shared.

65. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

66. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as UCM, of failing to employ reasonable measures to protect and secure PII/PHI.

67. Defendants' duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

68. Additionally, under 815 ILCS 530/10, Defendants had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach . . . in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10.

69. Defendants violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and IPIPA by failing to, or sharing PII/PHI with third-party vendors who failed to, use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and shares, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

70. Plaintiff and Class members are within the class of persons that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to protect.

71. The harm occurring as a result of the Data Breach is the type of harm that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or

deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

72. Defendants knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI and the importance of sharing PII/PHI with third-party vendors who maintain secure systems. Defendants knew or should have known of the many data breaches that targeted healthcare providers that collect and share PII/PHI in recent years.

73. Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

74. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or sharing PII/PHI with third-party vendors who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

75. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding, protecting, and sharing Plaintiff's and Class members' PII/PHI by failing to, or sharing PII/PHI with third-party vendors who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

76. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

77. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
***Against UCM Only on Behalf of the UCM Subclass***

78. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79. Plaintiff brings this claim individually and on behalf of the UCM Subclass against UCM only.

80. Plaintiff and UCM Subclass members gave UCM their PII/PHI in confidence, believing that UCM would protect that information. Plaintiff and UCM Subclass members would not have provided UCM with this information had they known it would not be adequately protected. UCM's acceptance and storage of Plaintiff's and UCM Subclass

members' PII/PHI created a fiduciary relationship between UCM and Plaintiff and UCM Subclass members. In light of this relationship, UCM must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and UCM Subclass members' PII/PHI.

81. Due to the nature of the relationship between UCM and Plaintiff and UCM Subclass members, Plaintiff and UCM Subclass members were entirely reliant upon UCM to ensure that their PII/PHI was adequately protected. Plaintiff and UCM Subclass members had no way of verifying or influencing the nature and extent of UCM's or its third-party vendors' data security policies and practices, and UCM was in an exclusive position to guard against the Data Breach.

82. UCM has a fiduciary duty to act for the benefit of Plaintiff and UCM Subclass members upon matters within the scope of their relationship. It breached that duty by failing to, and sharing PII/PHI with third-party vendors who failed to, properly protect the integrity of the system containing Plaintiff's and UCM Subclass members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and UCM Subclass members' PII/PHI that it collected and shared.

83. As a direct and proximate result of UCM's breaches of its fiduciary duties, Plaintiff and UCM Subclass members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in UCM's possession; (vi) future

costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
***Against UCM Only on Behalf of the UCM Subclass***

84. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Plaintiff brings this claim individually and on behalf of the UCM Subclass against UCM only.

86. In connection with receiving healthcare services, Plaintiff and all other UCM Subclass members entered into implied contracts with UCM.

87. Pursuant to these implied contracts, Plaintiff and UCM Subclass members paid money to UCM, directly or through their insurance, provided UCM with their PII/PHI. In exchange, UCM agreed to, among other things, and Plaintiff and UCM Subclass members understood that UCM would: (1) provide healthcare services to Plaintiff and UCM Subclass members; (2) collect, maintain, and utilize Plaintiff's and UCM Subclass members' PII/PHI to, among other things, facilitate treatment and the provision of healthcare services to Plaintiff and UCM Subclass members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and UCM Subclass members' PII/PHI; (4) protect Plaintiff's and UCM Subclass members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and UCM's representations; and (5) maintain the confidentiality of Plaintiff's and UCM Subclass members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

88. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and UCM Subclass members, on the one hand, and UCM, on the other hand. Indeed, as set forth supra, UCM recognized the importance of data security and the privacy of its patients' PII/PHI in its Privacy Policy. Had Plaintiff and UCM Subclass members known that UCM would not adequately protect its patients' PII/PHI, including by sharing their PII/PHI with third-party vendors who failed to have adequate security measures in place, they would not have agreed to provide UCM with their PII/PHI or received healthcare services from UCM.

89. Plaintiff and UCM Subclass members performed their obligations under the implied contract when they provided UCM with their PII/PHI and paid—directly or through their insurers—for healthcare services from UCM.

90. UCM breached its obligations under its implied contracts with Plaintiff and UCM Subclass members in failing to, and sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and UCM Subclass members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and UCM's representations.

91. UCM's breach of its obligations of its implied contracts with Plaintiff and UCM Subclass members directly resulted in the Data Breach and the injuries that Plaintiff and all other UCM Subclass members have suffered from the Data Breach.

92. Plaintiff and all other UCM Subclass members were damaged by UCM's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for

which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

## COUNT IV
## UNJUST ENRICHMENT

93. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. This claim is pleaded in the alternative to the breach of implied contract claim.

95. Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to UCM for healthcare services and through the provision of their PII/PHI, which UCM in turn used to pay NRS for its services. Plaintiff did so with an implicit understanding that Defendants would use some of these payments to protect the PII/PHI they collect, store, and use to provide health care.

96. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate their business operations and billing services.

97. As a result of Defendnants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

98. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to, or shared PII/PHI with third-party vendors who failed to, adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

99. Plaintiff and Class members have no adequate remedy at law.

100. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")**
***Against UCM Only on Behalf of the UCM Subclass***

101. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102. UCM offered and continues to offer healthcare services in the State of Illinois.

103. Plaintiff and Class members purchased and received healthcare services from UCM for personal, family, or household purposes.

104. UCM engaged in unlawful and unfair practices in violation of the ICFA by failing to, and sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security measures to protect and secure its patients' PII/PHI in a manner that complied with applicable laws, regulations, industry standards, and UCM's representations.

105. UCM makes explicit statements to its patients that their PII/PHI will remain private.

106. UCM's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. UCM violated this duty by failing to, and sharing PII/PHI with third-party vendors who failed to, implement reasonably secure data security policies.

107. UCM further violated the ICFA by failing to notify its current and former patients of the data breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

108. Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII/PHI. Further, UCM's failure to adopt reasonable practices in protecting and safeguarding its patients' PII/PHI will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiff and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for UCM's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

109. As a result of UCM's violations of the ICFA, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized

use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in UCM's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable under law;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: June 10, 2025

Respectfully submitted,

/s/ Ben Barnow

Ben Barnow (IL Bar No. 0118265)
Anthony L. Parkhill (IL Bar No. 6317680)
Riley W. Prince (IL Bar No. 6339536)
Nicholas W. Blue (IL Bar No. 6343317)
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com
nblue@barnowlaw.com

*Counsel for Plaintiff and the Putative Class*